## Sullivan v. Commonwealth.

(Decided June 14, 1916.)

## Appeal from Russell Circuit Court.

1. **Criminal Law—Stealing Public Records—Evidence—Sufficiency.—** In a prosecution for a conspiracy to steal public records, evidence examined and held sufficient to take the case to the jury and to sustain a conviction.

2. **Criminal Law—Public Records—Indictment—Statutes.—An** indictment is a record within the meaning of section 1197 of the Kentucky Statutes, making it an offense to steal, fraudulently deface, mutilate, destroy, or withdraw the record, or any part thereof, of any judicial proceeding pending or decided.

3. **Criminal Law—Conspiracy to Steal Public Records—Evidence.—** In a criminal prosecution for the stealing of certain indictments from the clerk's office, evidence that other indictments had theretofore been stolen and the clerk had been warned that another attempt would be made to steal indictments was admissible for the purpose of explaining the clerk's watchfulness of the office, and his remembrance of the details connected with the defendant's presence in his office, if so limited in its application; but a failure to so admonish the jury was not prejudicial.

4. **Criminal Law—Conspiracy—Acts and Declarations of Co-conspirators—Admissibility.—**The rule that the acts and declarations of a conspirator are not admissible against a co-conspirator, if made in his presence, unless they may be regarded as in the nature of an act done in furtherance of the common design, does not require that the acts and declarations shall refer in terms to the contemplated crime. It is sufficient, we think, if they refer to the subject matter of the proposed crime and tend to show some joint plan or concert of action in reference thereto.

5. **Criminal Law—Conspiracy—Acts and Declarations of Co-conspirators—Admissibility.—**In a criminal prosecution for conspiracy to steal certain indictments, certain letters of one of the alleged co-conspirators considered, and held admissible against the defendant, when accompanied by an instruction that they should not be considered, unless the jury believed from the evidence beyond a reasonable doubt that a conspiracy to steal the indictments had been entered into between the defendant and the writer of the letters.

LILBURN PHELPS, THOMAS Z. MORROW and W. R. CRESS for appellant.

M. M. LOGAN, Attorney General, O. S. HOGAN, Assistant Attorney General, A. A. HUDDLESTON and ROBERT E. LLOYD for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

On February 25th, 1913, the grand jury of Russell county returned an indictment against Arthur Brockman, Lucien Brockman and Silas A. Sullivan charging them with the offense of stealing public records. The indictment alleged a conspiracy between them to steal certain indictments against Arthur Brockman and charged that, in pursuance of said conspiracy and while the same existed, they did unlawfully, feloniously and fraudulently take, steal and carry away the indictments in question. When the case came on for hearing, the defendant, Silas A. Sullivan, demanded a separate trial. The jury found him guilty and fixed his punishment at confinement in the penitentiary for not less than two nor more than ten years. Judgment was entered accordingly and he appeals.

The evidence shows that a large number of indictments, including one against Arthur Brockman for seduction and several for the illegal sale of liquor, were stolen from a box in the circuit clerk's office on the night of December 12th, 1912. On the afternoon of that day Sullivan and Lucien Brockman went to the office of the circuit clerk. Sullivan asked to see the record of an old suit that had been filed away in the year 1906. As he was deputy sheriff at the time of the service of the processes in the case, his object was to ascertain whether or not all the costs had been paid. To this end he spent some time looking through the order book. About the same time Lucien Brockman and his attorney, J. H. Stone, were there examining certain indictments against Arthur Brockman and one indictment against Wilmur Brockman. These indictments were in a box marked "Equity N," which was kept in a pigeon hole in a vault in the clerk's office. After Lucien Brockman and his attorney had examined the indictments and had issued certain subpoena, the indictments were returned to the vault by the clerk. About this time Hugh Sharp, who was assisting the clerk, came to the office, and going to the vault took from the box in which they were contained two indictments for the purpose of making copies thereof. He made one copy, and having made a mistake in copying the other and finding it was too late to continue the work, he returned the indictments to the

box. Sullivan, Lucien Brockman and others who were in the clerk's office, left to go to their suppers. The clerk then locked his office and went to supper. After supper he returned and met Sullivan on the street. Sullivan asked if he was going to return to his office. At that time Sullivan was talking about running for county judge and wanted to discuss the matter with the clerk. Shortly thereafter Sullivan came to the office and a few minutes later Lucien Brockman also arrived. It was then about 7:30 o'clock. While there, Sullivan stated that he desired to urinate and asked if there was not a can kept in the vault for that purpose. He thereupon went into the vault and opened and closed the window. In a very short time he returned to the main part of the office. Not long thereafter he and Brockman left the office. Neither during the afternoon nor during the evening did Sullivan remove an overcoat which he wore. Before leaving the office he inquired of Lucien Brockman where he expected to remain that night. Brockman said he expected to stay at the Holt Hotel. Sullivan said he would also stay at the Holt Hotel, provided they would keep him. Prior to that time Sullivan had been assigned to a room at the Holt Hotel. After Sullivan and Brockman left the clerk's office, the clerk, before closing his office, went into the vault and discovered that the box containing the indictments was gone from its usual place. He searched for it that night but was unable to find it. The next morning he returned to his office and renewed the search. He found the box some distance from the pigeon hole in which it was kept and to which it was returned by Hugh Sharp. Upon opening the box he discovered that all of the indictments against Arthur Brockman had disappeared. The evidence for the Commonwealth also tends to show that Sullivan and Lucien Brockman roomed together at the hotel that night. The next morning they left before eating breakfast. Sullivan, though he lived several miles distant from Jamestown, started for his home on foot shortly after daylight, and left word for Brockman that the latter could overtake him. W. S. Knight met Sullivan between daylight and sun-up at the edge of the town. Ernest Garr, a negro porter at the Holt Hotel, testified that Sullivan asked him to state that on the night the indictments disappeared he searched Sullivan's pockets for whiskey and did not find anything

in them; that Sullivan also asked him to say that he, was coming up an alley and saw the light flash out in the hall as Sullivan came from the clerk's office, and that he went to the hotel with Sullivan. Lucien Brockman stated on cross-examination that he and Sullivan had agreed to stay all night at the hotel and go home the next morning. J. M. Shepherd testified that shortly after the November, 1912, election, his brother came to pay him a visit about eleven o'clock in the morning. Silas Sullivan and Ethel Webb came in and took dinner. The son of the brother of the witness had been indicted for some offense. Witness' brother asked Sullivan if he knew how many indictments had been returned during the October term of court. Sullivan said he had not looked over the docket. The brother then told him that he would like for his son to come back; that his son would return if there was no indictment against him, but if there was he did not want to return. Sullivan said: "You write to your son to come back. There will be no cases tried at the February term of court." The evidence for the Commonwealth further shows that Sullivan and Lucien Brockman started to Jamestown in a buggy on the morning of December 12th, reaching there about noon. They visited the various county offices and were together practically the whole of that day and during the evening. They also roomed together at the hotel that night. It was also shown that the clerk, who had just been elected, was engaged in teaching school, and that he did not reach his office until about four o'clock. While Brockman and Sullivan were in the office of the county attorney, Brockman remarked that "that party" had arrived. Later on they both went to the clerk's office. Sullivan testified that he came to Jamestown on December 12th, 1912, with Lucien Brockman and had stayed the night before at Logan Craven's, and had started out on horseback. His horse had fallen with him the day before and been crippled. When he reached Brockman's place the latter was going to Jamestown in a double rig. He then got in the buggy and came to town with Brockman. Some time before that day a witness in a suit claimed that there was some costs due him. Defendant believed that there was also some costs due him. He joined Brockman and went to town for the purpose of looking at the record. He also came to get

out a subpoena in a breach of peace case pending against himself and brother. While going to town Brockman stated that he was going there for the purpose of consulting a lawyer as to how to make out some brandy reports for his brother, who conducted a distillery at Russell Springs. Neither he nor Brockman discussed the indictments pending against Arthur Brockman. While he was in the clerk's office he spent the time looking at the record of the old suit and in talking generally with those who came in. He had nothing to do with the indictments that were stolen and did not take them away. After supper he said that he was going out to urinate. The clerk suggested that he could go into the vault and use the can. When in there he used the can, opened the window, threw out the contents and then closed the window. He was in there just long enough to accomplish his purpose and did not take any indictment from the box in question. While in the office he took no part in issuing subpoenas on the Arthur Brockman indictments and had nothing whatever to do with them. While there he did get the subpoena in the case against himself and brother. After supper he went to the office for the purpose of discussing his contemplated race for county judge with the clerk. He never, at any time, had any conversation with Lucien Brockman or Arthur Brockman in which he agreed to steal the indictments. He and Lucien Brockman did not contract to room together at the hotel. The proprietor suggested that he take Lucien in with him when he returned to the hotel after supper. He and Lucien Brockman both took breakfast at the hotel before he left. The reason that he left ahead of Lucien was that there was delay in getting Lucien's team ready, and he was in a hurry and cold and started out for the purpose of warming himself up. He denied the conversation with the hotel porter as detailed by the latter. He merely said to him: "You remember, Maje, that you searched my pockets for whiskey and you didn't find anything about my clothing," and he said he certainly did. Defendant also denied telling Mr. Shepherd to write to his son to come back as there would be no cases tried at the February term of the circuit court. He merely told Shepherd to tell his son not to come back, as the roads were unusually bad in the winter time and it was not likely that they would try his case before the June or October term. In

many features of his testimony Sullivan was corroborated by his co-defendant, Lucien Brockman. The Commonwealth introduced several witnesses who testified that Sullivan's reputation for truth and veracity was bad.

While the fact that the verdict is not sustained by the evidence is assigned as a ground for a new trial, this ground is not urged for a reversal of the judgment. Indeed, an examination of the facts above set out leaves no doubt that the evidence was not only sufficient to take the case to the jury, but to sustain the verdict.

The prosecution is based on section 1197 of the Kentucky Statutes, which is as follows:

"If any person shall steal, fraudulently deface, mutilate, destroy, or withdraw the record, or any part thereof, of any judicial proceeding pending or decided, or deface, destroy, tear out, steal, or mutilate any book or part thereof or record of any court, he shall be confined in the penitentiary not less than two nor more than ten years."

It is insisted that an indictment is not a record within the meaning of the statute. In this connection it is argued that the statute applies only to those records which are of a permanent nature and cannot be reproduced if destroyed. An examination of the statute, however, will show that by its very terms it applies, not only to books, but to the record, or any part thereof, of any judicial proceeding pending or decided. Just as the pleadings in a civil case are a part of the record of a judicial proceeding, so an indictment in a criminal case, which is a judicial proceeding in the name of the Commonwealth against the defendant, is necessarily a part of the record.

Indeed, in preparing the record for this appeal, it was necessary for the clerk to copy the indictment in this case in order that he might truthfully certify that the record here was a true copy of the entire record below. It follows that the demurrer to the indictment should not have been sustained on the ground that the indictments alleged to have been stolen were not public records.

Another contention of the appellant is that the court erred to his prejudice in permitting the Commonwealth to show that other indictments had been previously stolen, and that the circuit clerk had been warned that a

subsequent attempt might be made to steal indictments. In giving his testimony the clerk detailed numerous occurrences that took place on the day the indictments in question disappeared, and justified the accuracy of his memory by the statement that he was constantly on the lookout, and gave as a reason for his watchfulness the fact that other indictments had been stolen and he had been warned that perhaps other attempts to steal indictments would be made. Under these circumstances, we think the evidence complained of was admissible, though it would have been better, perhaps, had the trial court restricted its application. However, we conclude that its admission without restriction was not prejudicial to the accused.

The principal ground urged for reversal is the admission of two letters which were written by Arthur Brockman, one of the alleged conspirators, to J. H. Stone, an attorney-at-law. One of these letters is dated December 4th, 1912, and is as follows:

"J. H. Stone, Att-at-law,

Jamestown, Ky.

"Dear Att:—

"What do you think I can do as a compromise for what is in Russell, also the two in Adair?

"You just write me or Lucien at Russell Springs & I'll get it O. K.

"You and Silous talk to Meadows & huddleston & see what they will do & get the commonwealth to discontinue them until June court & I'll pay them for a compromise.

"See if they had not rather have some than none, tell them I don't want to give them all but will do them right.

"So see Jim & you or him see what Huddleston will do that I may know whether to locate else where or not.

"Do you think the Commonwealth would put them off another court if they tho't by that time I would pay them a reasonable amount of money?

"Hope to hear from you soon.

"Yours Respt.
"(Signed)        ARTHUR BROCKMAN.

"P. S.—Address me or Lucien at Russell Springs & I'll get it at once."

The other letter is dated December 8th, 1912, and is as follows:

"Mr. J. H. Stone (Att.-at-law),

Jamestown, Ky.

"Say what do you think we can do this time with my cases? Now I can't be there, so can you do anything by yourself? This is what I would say to anyone in law: Let nothing be too low to stoop to do for those who knows how to work the wires & you are sure of success. Now do this or have it done and I'll be there to help elect you & will use all my influence for you also pay you for you trouble & and above all see that you do carry Becham's Ridge for you well know with a little booze what I can do on Becham's Ridge also Burton's Ridge.

"So let me hear from you as soon as you do this or if you cannot let me hear from you.

"So I remain your friend as ever,

"(Signed) ARTHUR BROCKMAN."

By instructions 4 and 5 the court told the jury in substance that the conduct and transactions of Arthur Brockman and of Lucien Brockman, before the offense was committed and in the absence of the defendant, Sullivan, were not competent, unless the jury believed from the evidence, beyond a reasonable doubt, that the defendant, Sullivan, had conspired with Lucien Brockman and Arthur Brockman to take and steal the indictments. It is insisted that these instructions should not have been given at all, but that the letters in question should have been excluded from the consideration of the jury. The basis for this contention is that the letters are not declarations in furtherance of the alleged conspiracy to steal the indictments. Arthur Brockman, the writer of the letters, was the man against whom the stolen indictments were pending. The first letter is in reference to these very indictments. It refers to his brother, Lucien, by name, and to appellant as "Silous."

While it is true that the letter does not mention any plan to steal the indictments, it does refer to the indictments themselves, or the subject matter of the alleged conspiracy, and it shows that the writer was anxious to devise some means by which to get rid of the pending indictments. The second letter, which also relates to the pending indictments, contains the following language: "Let nothing be too low to stoop to do for those who knows how to work the wires & you are sure of suc-

cess." This letter does not speak of a compromise or of a continuance of the cases. It goes further and shows a manifest purpose to get rid of the indictments, regardless of the means that might be employed. The rule that the acts and declarations of a conspirator are not admissible against a co-conspirator, if made in his absence, unless they may be regarded as in the nature of an act done in furtherance of the common design, does not require that the acts and declarations shall refer in terms to the contemplated crime. It is sufficient, we think, if they refer to the subject matter of the proposed crime and tend to show some joint plan or concert of action in reference thereto. Under the circumstances, we conclude that the letters were admissible, when accompanied by the instruction that they should not be considered as evidence against appellant unless the jury believed beyond a reasonable doubt that a conspiracy to steal the indictments had been entered into between appellant and Arthur Brockman.

Finding in the record no error prejudicial to the substantial rights of appellant, it follows that the judgment should be affirmed, and it is so ordered.

Judge Hurt, not sitting.